UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 21-cr-259 (JMC) |
| v. : | |
| : | |
| JOHN DINE, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. John Dine has pleaded guilty to two second degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Dine to fourteen days' incarceration on Count One and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

I. **Introduction**

Defendant John Dine, a fifty-nine year old quality control technician, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful

1

transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Dine pleaded guilty to violations of 40 U.S.C.§§ 5104(e)(2)(D) and (G). The government's recommendation is supported by the defendant's decision to enter and remain within the Capitol while the riot swirled around him, demonstrating his intent and conviction in attending and remaining to support the mob.  This understanding is further supported by his choice to remain within the Capitol for twenty minutes, only leaving when ordered to do so by uniformed police.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Dine's crime support a sentence of fourteen days of incarceration along with a probationary term of three years, 60 hours of community service, and $500 in restitution, in this case.

II.     **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 9 (Statement of Offense).

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Dine's Role in the January 6, 2021, Attack on the Capitol*

Dine traveled to Washington D.C. to support Donald Trump and attended then President Trump's "Stop the Steal" rally on January 6, 2021.  He stood in front of the Washington Monument to watch the rally at the Ellipse.  In a later pre-charge voluntary interview with the FBI, discussed further *infra*, Dine stated that had concerns about alleged election irregularities in the Presidential election, which motivated him to attend the rally.  Dine understood that Congress and then Vice President Pence were carrying out their duties on January 6 related to the 2020 presidential election.  Dine believed that the ultimate goal of the rally and protest was to stop the election certification to determine whether voting irregularities in the Presidential election existed.  He attended the Rally with Nicholas Reimler and Jeffrey Wakeford; Wakeford is his cousin and Reimler was Dine's co-worker.  The three of them traveled together throughout the events of January 6, 2021.  *See* Image 1 (below) (Dine in box (center), Wakeford with red hair (right), Reimler in green beanie (left)).



*Image 1: Dine (grey hat and glasses) at the rally at the rally in front of the Washington Monument.* [2]

---

[2] Where present, red annotations on images have been applied for purposes of clarity and are not present in the original.

Following the rally, Dine walked to the Capitol, along with a large crowd from the rally. He walked up from the lower west terrace of the Capitol to the upper west terrace. As Dine stated in his interview (discussed *infra*), he observed the chaos, including violent altercations between rioters and police, that the west front of the Capitol had devolved into by the time he arrived. He did not participate in any violent actions or altercations with the police but did walk through the crowd to the upper west terrace. *See, e.g.*, Image 2 (below), showing Wakeford (Dine on right) taking a selfie with rioters on the west terrace railings; *see also* Image 3 (below), showing Dine passing by uniformed MPD officers on the upper west terrace.



*Image 2 (left): Selfie taken outside the Capitol. Dine on right.*
*Figure 3 (right): Metropolitan Police Department bodycam footage (timestamp 15:04) showing Dine (left) outside the Capitol, pausing as Wakeford uses his cell phone.*

As captured on closed circuit television ("CCTV") footage from inside the Capitol, Dine entered the Capitol at 3:07 PM, through the Senate Wing Door. *See* Image 4 (below). At this time, windows adjacent to the Senate Wing Door were broken, alarms were blaring, and rioters were entering and exiting the Capitol through the broken windows as well as the Senate Wing Door, that rioters broke open less than an hour before. Dine saw crowds of rioters pushing past

police and violent confrontations between the crowd of rioters and police officers at the Capitol throughout his time on Capitol grounds and personally saw the broken windows adjacent to Senate Wing Door. As he entered, Dine carried a flag associated with then-President Trump, which he had found on the ground on January 6, picked up, and carried with him through the day. The windows adjacent to the Senate Wing door were broken and rioters were intermittently entering and exiting the Capitol through the broken windows.



*Figure 4: Dine entering Capitol via Senate Wing Door at 3:07 PM (magnified inset; dine in black hoodie with glasses in center)*

Dine walked down a hallway to his right toward the Crypt and entered it. Dine remained in the Crypt for approximately eleven minutes. As captured on CCTV at approximately 3:23 pm time, Dine crossed the Crypt, passed police officers as he walked to the center of the Crypt, then walked out of the Crypt, and followed the hallway back to the Senate Wing Door. *See* Image 5 (below). During his time in the Crypt, he was standing near or sitting on a bench on the outer perimeter of the Crypt for approximately nine minutes with Wakeford and Reimler.



*(a)*                                                                                       *(b)*

*Figure 5: (a) Dine moving from wall of Crypt towards center then
(b) exiting other side of Crypt at approximately 3:24 PM.*

Once back in the hallway near the Senate Wing Door, Dine exited the Capitol through a broken window next to the Senate Wing Door at approximately 3:27 PM.  *See* Image 6 (below). Dine had to exit through the window because the US Capitol Police had succeeded in closing the Senate Wing Door, preventing further rioter entry.  However, rioters still needed to be removed (and the USCP did not want to risk being overrun by reopening the door.  As a result, rioters inside the Capitol at that time had to leave via the window.  After exiting the Capitol, Dine later left the Capitol grounds.

6

 

*Figure 6: Dine exiting through broken window next to Senate Wing Door*

*Defendant's Interview*

On December 7, 2023, FBI agents interviewed Dine. He stated that on January 5, 2021, Dine drove from his home in Granite City, IL, to the Washington, D.C. metro area with two other individuals.[3] Dine and the other individuals spent the night of January 5, 2021, in a motel in the D.C metro area.

On January 6, 2021, Dine and the other individuals walked from the motel to the rally. Dine stated that he wanted to travel to Washington, D.C. to support Donald Trump and attend the January 6 rally Trump would be speaking at. Dine stated that he had concerns about voting irregularities in the Presidential election. Dine stated that he hoped to support Donald Trump and address those concerns by travelling to D.C. and attending the rally. Dine understood that Congress was certifying the 2020 presidential election on January 6 related to the presidential election. Dine believed that the ultimate goal of the rally and protest was to stop the election certification to determine if there had been irregularities in the Presidential election.

---

[3] As discussed, *infra*, Dine was accompanied by two other individuals: Jeffrey Wakeford and Nicholas Riemler. Reimler has already been prosecuted and sentenced; Wakeford has pled guilty and will be sentenced by Judge Nichols on October 25, 2024.

Dine admitted that he entered the Capitol on January 6, 2021. Dine confirmed that he personally observed physical altercations between the crowd at the Capitol and law enforcement at the Capitol. Dine also confirmed that he observed broken windows adjacent to the door (Senate Wing Door) through which he and the other two individuals entered the Capitol. *See* Image 4. Dine stated that he found and picked up the flag he is seen carrying in the CCTV and body-worn camera footage during the events of January 6.

When discussing his entry to and remaining in the Crypt, Dine stated that at some point following his entry and while he was remaining in the Crypt, police officers instructed him, along with other rioters, to group in the center of the room. These statements confirm the sequence of events captured by CCTV footage, discussed above. Dine admitted to exiting the Capitol via broken windows. *See* Image 5.

During the December 7, 2023, interview, Dine identified himself and his travelling companions in various photographs and still images taken from CCTV footage, including the CCTV footage from which stills have been taken above. *See, e.g.*, Image 4, 5, and 6.

*The Charges and Plea Agreement*

On May 29, 2024, the United States charged Dine by a four-count Information with violating 18 U.S.C. § 1752 and 40 U.S.C. § 5104. On June 27, 2024, pursuant to a plea agreement, Dine pleaded guilty to Counts Three and Four of the Information, charging him with a violation of 40 U.S.C. §§ 5104(e)(2)(D) and (2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

Dine now faces a sentencing for violating 40 U.S.C. § 5104 (D) and (G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of

imprisonment and a fine of up to $5,000 on each guilty count. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of fourteen days of incarceration along with a probationary term of three years.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Dine's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Dine, the absence of violent or destructive acts is not a mitigating factor. Had Dine engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Dine's case is his determination to be present within the Capitol Building even while the riot swirled around him. He persisted through the chaos of the day at every stage of the events of January 6, 2021 – crossing the core of the Capital City, climbing the stairs on the West Face of the Capitol even while the riot was in full bloom and,

9

eventually, entering the Capitol Building through the rioting crowd and making his way through that crowd into the Crypt. Dine entered the Capitol and remained within the Capitol during a clearly chaotic occupation of our seat of government, demonstrating his intent and conviction in attending and remaining to support the mob. Additionally relevant is the amount of time he spent within the Capitol – he spent approximately twenty minutes within the Capitol, contributing to the mob and swelling its ranks during that time; he was present in the Crypt as police began a round of clearing rioters and notably did not make any moves to leave prior to being ordered to by police. This was not a brief intrusion – this was a substantial entry with defined movement and presence within the seat of our Nation's government. Dine's decision to leave was not his own – only when the police began to control the area and were able to effectively order his exit did he begin to do so. Even his manner of exit shows how different the circumstances were at his exit: while he had entered through the Senate Wing Door as a member of the riot, he left through a broken window because the police had begun to resecure parts of the Capitol.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Dine's History and Characteristics

Dine has a felony possession of a controlled substance charge from 1997. *See* PSR at ¶ 35.[4]

On January 6, 2021, Dine was married with two stepchildren, one child, and many grandchildren. Despite this strong network of support, Dine callously put his actions above any concern for his family by committing these offenses and he likely knew the risks.

---

[4]  Date of Arrest:        09/03/1997 (Age 32)
     Charge:                Possession of a Controlled Substance-Felony
                            Maries County Court, Vienna, MO (CR297255F)
     Agency:                Maries County Sheriff; Vienna, MO
     Disposition:           09/10/1997: Charge Filed

Therefore, a lengthy period of probation combined with a short period of incarceration is warranted to ensure that he is supervised while in the community and that he does not again engage in the type of conduct that brought him before this Court in this case.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider. As other judges in this district have noted, "others must be sufficiently deterred from engaging in similar actions. Being around and within a violent riot prevents police from dealing with those who are violent." *United States v. Joshua Doolin*, 21-cr-447 (CJN), Sentencing Tr. at 81 (Nichols, J.).

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a incarceration and a period of probation. The determination that Dine showed in entering the Capitol and remaining within the Capitol while the riot swirled around him, demonstrates his intent and conviction in attending and remaining to support the mob. Probation is insufficient; this Court should prescribe incarceration in order to ensure that he understands, and remembers, the seriousness of his actions on January 6, 2021, and does not again engage in participation in a violent mob or other political violence. As Judge Nichols noted, "as I've said in every case I've had, every participant in the riots made an impact, as one of the primary strengths of the rioters on that day was their sheer number leading to many circumstances in which law enforcement was overwhelmed." *United States v. Joshua Doolin*, 21-cr-447 (CJN), Sentencing Tr. at 79 (Nichols, J.).

The Court must sentence Dine in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[5] This Court must sentence Dine based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Dine has pleaded guilty to Counts Three and Four of the Information, charging him with violation of 40 U.S.C. §§ 5104(e)(2)(D) and (2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." "Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012); *see United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The government rarely recommends home detention for January 6 defendants, including misdemeanants; its recommendation often include at least some period of incarceration. Where it has, that recommendation commonly comes either from earlier cases where there were few comparators (especially as compared to now) or especially unique circumstances. Neither of those situations are present here; a standard sentence of incarceration is, therefore, appropriate.

For example, in *United States v. Ruben Reyna*, 23-cr-5350 (CKK), the government recommended 14 days' incarceration and 12 months' probation and the court imposed that recommendation on a guilty plea as to 18 U.S.C. § 1752(a)(1), as here. ECF 25 (Sentencing Memorandum), 34 (Judgment). Reyna was only in the Capitol for one minute; Dine was in the Capitol for twenty. And, similar to Reyna, Dine entered through a broken door (Reyna through a broken window). Reyna had additional conduct, such as posting multiple images of his actions to Facebook; here, Dine did not.

Another example of a standard recommendation may be found in *United States v. William Wilkerson*, 23-cr-249 (CJN), where the Government recommended thirty days' incarceration and the Court imposed two years' probation on a guilty plea as to 40 U.S.C. § 5104(e)(2)(G). ECF 21 (Sentencing Memo), ECF 24 (Judgment). Wilkerson was in the Capitol only for approximately five minutes; Dine was in the Capitol for twenty. Wilkerson did not proceed beyond the Senate Wing Door hallway; Dine proceeded beyond the hallway deep into the Capitol, into the Crypt. However, Wilkerson showed no remorse in a voluntary post-arrest interview and also posted multiple times on social media after his incursion into the Capitol.

It is true that Dine's traveling companion, Nicholas Reimler, has already been sentenced. *See United States v. Nicholas Reimler*, 1:21-cr-239. While Reimler's conduct was very similar to Dine's, the government's recommendation here necessarily differs as described above. Reimler pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). *But* Reimler pled guilty on September 17, 2021, when there were very few comparators. Judge Moss sentenced Reimler to one month home detention in December 2021 with thirty-six (36) months of probation, 60 hours community service (to be completed within thirty months), and $500 restitution. Sentencing Hrg. Tr. at 26. In addition, Judge Moss restricted Reimler's social media usage as a special condition of probation. Here, we now have more fulsome comparators and the government's (and the Court's) understanding of the full scope of the criminal conduct of January 6, 2021, has developed since that time. Accordingly, the government's recommendation reflects this current understanding and adequately accounts for the seriousness of Dine's criminal conduct on January 6.

Additionally, Dine's third traveling companion, Jeffrey Wakeford, has pled guilty to one count of violating 18 U.S.C. § 1752(a)(1). *United States v. John Dine*, 1:24-cr-258, ECF Minute Order (July 17, 2024). Wakeford's conduct is similar to Dine's conduct and the government's recommendation to Judge Nichols is also fourteen days' incarceration and thirty-six months' probation. Wakeford's sentencing is on October 25, 2024. The government will inform this Court of Judge Nichols' sentence imposed on Wakeford.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

V.     **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Dine must pay $500 in restitution, which reflects in part the role Dine played in the riot on January 6.[7] Plea Agreement at ¶ 11 (p. 6). As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Dine's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 88.

VI.   **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Dine to fourteen days' incarceration on Count One and 36 months' probation on Count Two. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Dine's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

                                            Respectfully submitted,

                                            MATTHEW M. GRAVES
                                            United States Attorney
                                            D.C. Bar No. 481052

                              By:   */s/Patrick Holvey*

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

                    PATRICK HOLVEY
                    DC Bar No. 1047142
                    Assistant United States Attorney
                    United States Attorney's Office
                    601 D Street N.W.
                    Washington, D.C. 20530
                    Telephone: 202-252-7224
                    Patrick.Holvey@usdoj.gov